# United States Court of Appeals
## For the First Circuit

No. 00-2340

SAVE OUR HERITAGE, INC., ET AL.,

Petitioners,

v.

FEDERAL AVIATION ADMINISTRATION,

Respondent,

and

SHUTTLE AMERICA CORPORATION and MASSACHUSETTS PORT AUTHORITY,

Intervenors.

ON PETITION FOR REVIEW OF AN ORDER OF

THE FEDERAL AVIATION ADMINISTRATION

Before

Boudin, Chief Judge,

Selya and Lipez, Circuit Judges.

Andrea C. Ferster for petitioners.
Elizabeth S. Merritt, Associate General Counsel, Paul W. Edmondson, General Counsel, Anita C. Canovas, Assistant General Counsel, National Trust for Historic Preservation, Frances Gould, Special Assistant Attorney General for the Commonwealth of Massachusetts, Massachusetts Historical Commission, Neil T. Proto, Patricia A. Deem and Verner Liipfert Bernhard, McPherson and Hand on brief for National Trust for Historic Preservation, Commonwealth of Massachusetts, Honorable Congressman Marty Meehan, Historic Concord, Inc., and Freedom's Way Heritage Association, Amici Curiae.

M. Alice Thurston, Environment and Natural Resources Division, Department of Justice, with whom John C. Cruden, Acting Assistant Attorney General, James C. Kilbourne, Environment and Natural Resources Division, Department of Justice, and Daphne A. Fuller, Manager, Environmental Law Branch, Federal Aviation Administration, were on brief for respondent.

Roscoe Trimmier, Jr. with whom Richard J. Lettieri, M. Concetta Burton, Amy E. Serino, Ropes & Gray, David S. Mackey, Ira M. Wallach and Michael P. Sady were on brief for intervenor Massachusetts Port Authority.

H. Bissell Carey, III, Clive D. Martin and Robinson & Cole LLP on brief for intervenor Shuttle America Corporation.

---

October 23, 2001

---

BOUDIN, <u>Chief Judge</u>.     The Federal Aviation Administration ("FAA") authorized Shuttle America Airlines ("Shuttle America") to provide scheduled passenger service to New York's LaGuardia Airport ("LaGuardia") from Hanscom Field ("Hanscom"), a general aviation airport that lies 15 miles northwest of Boston abutting the towns of Bedford, Concord, Lexington, and Lincoln.  The petitioners--two preservationist organizations, three of the four towns (Bedford is an intervenor), and stewards of several nearby historic sites--seek review of the FAA decision on the ground that the agency did not adequately consider the adverse effect of the additional Shuttle America flights on historic and natural resources near Hanscom.

Hanscom has been a major aviation facility since 1940, when the Commonwealth of Massachusetts first acquired the site to accommodate the U.S. Army Air Corps.  In 1973 the Massachusetts Port Authority ("MassPort") converted a portion of the site into a general aviation facility serving corporate aviation, flight schools, air charter operations, light cargo, and private business and recreational flights.  (The U.S. Air Force uses the remainder as Hanscom Air Force Base.)  In 1995, there were about 95,000 general aviation and military flights (defined as a departure and an arrival) at Hanscom.

In recent years, MassPort and the FAA have expanded commercial passenger service at Hanscom, seeking to lessen congestion at Boston's Logan International Airport. These steps have concerned community groups who fear that the increased noise, air pollution, and surface traffic from the additional flights will harm the natural and historic resources near Hanscom. These sites include Minute Man National Historic Park, Walden Pond, and the homes of eminent American authors such as Ralph Waldo Emerson and Louisa May Alcott. The main access road to Hanscom is a part of Route 2A, which runs through the heart of Minute Man National Park.

In July 1999, MassPort backed a plan to let Shuttle America--a commuter airline then operating out of several airports on the East Coast--provide scheduled passenger service at Hanscom. To this end, Shuttle America asked the FAA to add Hanscom to the list of airport destinations in its operating specifications. MassPort asked the FAA to upgrade Hanscom's operating certificate to a "full Part 139 certificate," which allows use of planes with greater than 30 seats. See generally 14 C.F.R. Part 139 (2000).

The FAA granted both requests in September 1999, and Shuttle America immediately commenced passenger service out of Hanscom, with four daily round-trip flights. The FAA determined

that it did not need to perform an environmental analysis for the two approvals because they were categorically excluded from review under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq. (1994). It also concluded that the categorical exclusion under NEPA obviated the need for consultation under Section 106 of the National Historic Preservation Act of 1966 ("NHPA"), 16 U.S.C. § 470f (1994).

The Advisory Council on Historic Preservation, which is authorized to enforce NHPA, see 16 U.S.C. § 470s, questioned the FAA's reading of NHPA, and petitioner Save Our Heritage unsuccessfully sought reconsideration and rehearing of both the Part 139 certification and the addition of Hanscom to Shuttle America's operating specifications. However, no party sought timely judicial review of either of the FAA's decisions; such review is now time-barred. 49 U.S.C. § 46110(a) (1994).[1]

In May 2000, Shuttle America applied for the operating specifications amendment at issue in this case--an amendment to add LaGuardia to its list of approved airport destinations. It proposed to make seven round-trip flights between Hanscom and LaGuardia, with the possibility of eventually expanding the

_____

[1]The four Hanscom-area towns unsuccessfully sued in Massachusetts state court to enjoin MassPort's application on the ground that it violated promises made in MassPort's 1978 Hanscom Master Plan. Hanscom Area Towns Comm. v. Mass. Port Auth., CIV No. 99-04461-F (Mass. Sup. Ct. 1999).

service to ten flights a day.  The FAA expressed doubt that NHPA consultation was required, but in light of the Advisory Council's earlier concerns, it decided it would be "prudent" to consult provisionally with the Massachusetts Historical Commission, which the Commonwealth had designated as its NHPA consulting agency.  After conducting an environmental analysis, the FAA proposed a finding that the additional flights to LaGuardia would have no potential adverse effect on historic properties.

Petitioners Save Our Heritage and the Hanscom-area towns sent the FAA detailed criticisms of its proposed finding, and the Massachusetts Historical Commission also refused to concur.  After providing additional documentation in an unsuccessful effort to persuade the Commission, the FAA terminated the consultation and, on October 27, 2000, issued the amendment ("the LaGuardia amendment").  Shuttle America began commercial service from Hanscom to LaGuardia with five round-trip flights per day, later reaching a peak of seven daily round-trip flights in January 2001.[2]

---

[2]Since that time, Shuttle America has entered into Chapter 11 reorganization proceedings, but it continues to maintain one LaGuardia flight daily and has stated that it hopes eventually to reinstate its previous level of service.

On direct review, 49 U.S.C. § 46110(a), petitioners now ask us to set aside and enjoin the LaGuardia amendment on the grounds the FAA decision violated NEPA, NHPA, and Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c) (1994) (originally codified at 49 U.S.C. § 1653(f) (1970)). The statutory requirements are described below. The gist of the FAA's position is that its "effects" determination--that the addition of seven to ten flights a day would have no significant environmental impact--exempted the amendment from or otherwise satisfied these requirements.

At the threshold, the FAA and supporting intervenors raise two objections to our consideration of the case. The first is that the petitioners lack Article III standing, and the second is that the petitions are effectively out-of-time attacks on prior agency orders. Because the first challenge is constitutional, we start with it.

The basic requirements for Article III standing are that the petitioner is someone who has suffered or is threatened by injury in fact to a cognizable interest, that the injury is causally connected to the defendant's action, and that it can be abated by a remedy the court is competent to give.[3] What

---

[3]<u>Cotter</u> v. <u>Mass. Ass'n of Minority Law Enforcement Officers</u>, 219 F.3d 31, 33 (1st Cir. 2000), <u>cert. denied</u>, 531 U.S. 1072 (2001); <u>Town of Norwood, Mass.</u> v. <u>Fed. Energy Reg. Comm'n</u>, 202

-7-

constitutes a "cognizable interest" can present vexing problems, see Chemerinsky, Federal Jurisdiction § 2.3, at 68-74 (3d ed. 1999), but here the FAA and supporting intervenors concede that aesthetic and environmental injury are cognizable, see Sierra Club v. Morton, 405 U.S. 727, 734 (1972).

Rather, the objections to standing are threefold. The first, and least persuasive, is the suggestion that even if some individuals or organizations are adversely affected by the increased flights, none of the petitioners or identified members of petitioner organizations have shown that they are among those injured. Admittedly, a specified petitioner or identified member must be within the affected group. See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc., 528 U.S. 167, 181-84 (2000).

Here, the petitioners comprise nonprofit environmental or preservationist associations such as Save Our Heritage; the towns located near Hanscom; and at least two petitioners that own nearby historic sites: the Walden Woods Project, which owns part of the Walden Woods site and operates a Thoreau research and educational facility on it; and the Louisa May Alcott Memorial Association, which manages the writer's home. It is sufficient for the case to proceed if at least one petitioner

---

F.3d 392, 405-06 (1st Cir.), cert. denied, 531 U.S. 818 (2000).

has standing, Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 971-72 (1st Cir. 1993).

There is little reason to doubt that the two nonprofit landowners (Walden Woods Project and the Alcott Association) would be affected by both noise and air pollution, given their function and proximity to Hanscom; and it is likely, although unnecessary to decide, that the three towns themselves would have a direct interest, e.g., in traffic congestion.[4]  We need not resolve whether the petitioner associations have established standing based on the rather sparse allegations of injury to the interests of their individual members.  See Int'l Union, United Auto., Aero. & Agric. Implement Workers of Am. v. Brock, 477 U.S. 274, 281-82 (1986).

Next, the FAA says that there is no actual or threatened adverse effect on any petitioner because, according to the FAA's findings, the small number of additional flights will have no significant environmental impact.  At first blush, this appears to be a question of the merits rather than one of standing; the petitioners certainly allege substantial effects and challenge both the FAA's contrary findings and the procedures used to reach them.

---

[4]Lujan v. Defenders of Wildlife, 504 U.S. 555, 572 n.7 (1992); Douglas County v. Babbitt, 48 F.3d 1495, 1501 (9th Cir. 1995), cert. denied, 516 U.S. 1042 (1996).

We need not rule out the possibility of cases where the claim of impact is so specious or patently implausible that a threshold standing objection might be appropriate. See, e.g., Town of Norwood, 202 F.3d at 406; Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 669 (D.C. Cir. 1996). But beyond that, we think that the likelihood and extent of impact are properly addressed in connection with the merits and issues of harmless error. Breyer & Stewart, Administrative Law and Regulatory Policy 1107 (2d ed. 1985); cf. Bell v. Hood, 327 U.S. 678, 681-84 (1946). A reasonable claim of minimal impact is enough for standing even though it may not trigger agency obligations.

Third, the FAA points out that the order here under review did not increase the number of flights that Shuttle America is authorized to operate at Hanscom. Given prior orders that are now beyond review, Shuttle America was and is entitled to fly an unlimited number of flights to its other, already-approved airports regardless of the outcome of this case. Thus, says the FAA, the order permitting flights to LaGuardia cannot be the cause of the alleged injury to petitioners, because it could fly the same number of flights even if the order were overturned.

If the same number of flights carrying the same number of passengers would be flown regardless of the present order,

the order would hardly be the but-for cause of any impact due to more flights or ground traffic. But as a matter of common sense, Shuttle America likely sought authorization for LaGuardia because it would generate some additional traffic over and above its existing demand. Shuttle America has not shown or offered to show that the number of flights and the amount of car traffic would be <u>identical</u> even without the authorization. Petitioners asserting standing are not required to negate every possibility that the outcome might be the same under highly unusual circumstances.

The FAA makes a separate and quite different threshold objection. It says that petitioners are making out-of-time attacks on prior orders. It points out that the statute imposes a 60-day limit on direct review, 49 U.S.C. § 46110(a), and, no petition for review having been filed within that time, it argues that it is not open to petitioners now to challenge the orders entered in September 1999 allowing Shuttle America to operate from Hanscom and Hanscom to handle commercial flights using larger planes.

No doubt much of the impact on nearby natural and historic sites, assuming the allegations are true, stems from these earlier orders and not from the authorization to add a limited number of flights to LaGuardia. Nevertheless, the

petitioners are entitled to claim that an additional impact will be felt from the now-authorized LaGuardia flights, over and above the effects of the prior orders. Whether or not the plausible added effects are so slight as to justify the shortcuts taken by the FAA is a merits issue yet to be addressed; but it does not make an attack on this alleged incremental impact an attack on the wrong order.

Only to the extent that petitioners are actually seeking redress from the effects of the present orders are their petitions timely, and this limitation must be borne in mind in considering the arguments. Admittedly, there is some language in the briefs that appears to attack the earlier orders because of alleged infirmities in its findings or procedures. But the possibility that some of the petitioners' arguments are time-barred does not defeat those actually directed to the more recent order.

This brings us to the merits. Although the claims can be segmented in several ways, the underlying issues basically reduce themselves to two: whether the FAA erred substantively in concluding that the additional flights--up to ten new round trips a day--would have a de minimis environmental impact and whether, regardless of impact, the FAA erred procedurally in failing to consult further with governmental agencies concerned

with historic preservation. We begin with the "substantive" issue which arises, in slightly different frameworks, under three different statutes.

The most familiar is NEPA, which requires agencies to develop a detailed environmental impact statement (an "EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The NEPA regulations permit agencies to conduct a less demanding "environmental assessment" to determine whether an EIS is required; if not, the agency must explain its determination in a "finding of no significant impact." 40 C.F.R. §§ 1501.4 (2000).

In a regulation whose validity is not in dispute, the FAA effectively concedes that the LaGuardia amendment qualifies as a major federal action. Dep't of Transp., Fed. Aviation Admin. Order 1050.1D, "Policies and Procedures for Considering Environmental Impacts," App. 4, ¶ 3(e).[5] However, a categorical exclusion excuses the FAA from preparing either an EIS or an environmental assessment for "operating specifications and amendments thereto which do not significantly change the

_____

[5]FAA Order 1050.1D, which was in effect at the time of the LaGuardia amendment, is the FAA's formal rule for implementing all three statutes implicated in this case. 49 Fed. Reg. 28,501 (July 12, 1984). A proposed revision to the order is not relevant here. See 64 Fed. Reg. 55,526 (Oct. 19, 1999).

operating environment of the airport."  FAA 1050.1D, App. 4, ¶ 4(h).

This exclusion is itself qualified by an "extraordinary circumstances" provision which requires at least an environmental assessment for an otherwise excluded action if the action is, inter alia, "likely to have an effect that is not minimal on properties protected under Section 106 of [NHPA] or Section 4(f) [of the Transportation Act of 1966]," or "likely to be highly controversial on environmental grounds."  FAA Order 1050.1D, ¶ 32.  Petitioners rely on both of these exceptions and argue that the additional flights have more than minimal effects and were highly controversial.

NHPA and Section 4(f) impose different requirements than NEPA, in the service of somewhat more focused interests; but the requirements of concern here--with one possible qualification regarding an obligation to consult--both turn (as with NEPA) on whether the agency action poses a plausible environmental threat.  A brief description of the two statutes makes this clear.

NHPA, heavily relied on by petitioners, is designed to protect certain "historic properties," which indisputably include sites near Hanscom.  Section 106 of the statute requires that prior to a proposed federal "undertaking," the agency must

"take into account the effect" on such properties and allow the Advisory Council on Historic Preservation a "reasonable opportunity to comment." 16 U.S.C. § 470f. The act thus imposes both a substantive obligation to weigh effects in deciding whether to authorize the federal action and a procedural obligation to consult. See generally 36 C.F.R. Part 800 (2000).

The grant of a permit such as the LaGuardia authorization can certainly qualify as an undertaking. 16 U.S.C. § 470w(7)(C); 36 C.F.R. § 800.16(y) (2000); see also Sugarloaf Citizens Ass'n v. Fed. Energy Reg. Comm'n, 959 F.2d 508, 515 (4th Cir. 1992). But even if the approval of the LaGuardia flights is assumed to be an undertaking, the substantive obligation to "take into account the effect" of the flights on historic properties is beside the point if there is no potential adverse effect. See 36 C.F.R. § 800.3(a)(1) (2000). To that extent, the question under NEPA and under NHPA is the same: whether the FAA erred in finding that any impact of the newly authorized flights on the surrounding area was de minimis.

The last of the three statutes--Section 4(f) of the Department of Transportation Act--is even more stringent where it applies. It protects certain public parks and historic

-15-

sites, again indisputably including some near Hanscom, from any "transportation program or project" requiring the "use" of such park or land, unless certain quite restrictive tests have been met. To proceed in the teeth of such a "use," the agency must find that there is no feasible alternative to using that land and that the program or project includes all possible planning to minimize harm. 49 U.S.C. § 303(c).

At first blush, one might think that Section 4(f) could have nothing to do with authorizing new flights from an existing, physically unaltered airport; but the statute has been read to apply not only to a physical use or occupancy of protected parks or land but also to activities that will have a serious indirect impact on the protected park or land--a so-called "constructive use." 23 C.F.R. § 771.135(p)(1)(iii) (2000); Morongo Band of Mission Indians v. Fed. Aviation Admin., 161 F.3d 569, 583 (9th Cir. 1998). Once again, the FAA's finding that the LaGuardia flights would have only a de minimis effect would avoid the statute if the finding were to be upheld. Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir. 1982).

What, then, underpins the FAA's finding of de minimis impact in this case? The starting point is that independent of the LaGuardia flights, Hanscom handled just under 100,000 flights in 1999, and the disputed LaGuardia flights would add,

at a maximum, ten more flights per day.  The more realistic estimate of seven flights, according to the FAA, would produce an annual increase in Hanscom flights of about 2.5 percent--a number that absent special circumstances would approach the trivial.

This figure might at first appear to understate the potential environmental effect because most existing Hanscom flights are private aircraft, which are somewhat smaller and carry fewer passengers than even the modest 50 passenger turboprop planes used by Shuttle America.  On the other hand, some of the resulting ground traffic occurs in non-peak periods where existing levels are light, and the new flights use turboprop aircraft considerably quieter than the corporate jets and other civilian aircraft currently using the airport.  Thus, certain effects of the additional flights may be less than the already small percentage increase in the number of flights.

But we need not rely on such inferences because here the FAA directly studied the three types of potential effects from the additional flights: noise, fuel emissions, and surface traffic from passenger travel to and from the airport.  As background for considering the effects, the FAA extrapolated from MassPort's 1995 Generic Environmental Impact Report ("the GEIR"), actually completed in 1997, which projected and

extensively assessed the noise, emissions, and traffic effects of future Hanscom operations under zero, modest, and robust growth scenarios for commercial aviation.  It also relied on a surface traffic study performed in 2000 for the adjacent Hanscom Air Force Base.

The FAA summarized its findings in two letters (on September 15, 2000 and October 6, 2000) to the Massachusetts Historical Commission.  The FAA first compared the actual number of flights in 1999 (prior to the LaGuardia authorization) with the GEIR's 1999 projections under the modest growth scenario, and found that the GEIR's forecast was nearly exact (approximately 99,000 flights).  This both confirmed the accuracy of the GEIR and, since the GEIR indicated no significant environmental concerns under the modest growth scenario, showed that pre-amendment baseline conditions were acceptable.

The FAA then conducted its own studies, which found that the additional LaGuardia flights would not exacerbate environmental conditions. As to noise, the FAA found that the additional flights would have a 1 percent or less increase in the 65 DNL dB noise contour, which indicates noise levels compatible with all land uses, see 14 C.F.R. Part 150, App. A, Tbl. 1 (2001), under a test in which a 17 percent increase is

-18-

deemed significant.  It also found that the 65 DNL dB noise contour would continue to remain "almost completely on airport property" and that most of Minute Man National Park and Walden Woods would fall outside the 55 DNL dB line.[6]  It thus concluded that the area around Hanscom "should not experience appreciable increases in aircraft noise or overflights" as a result of the added air traffic.

For air quality effects, the FAA used a model that took account of emissions both from aircraft (accounting for factors such as equipment type and including take-off, taxi, and idling time) and surface vehicles (both passenger traffic and ground support equipment).  The FAA concluded that the potential emissions associated with the LaGuardia flights were "below de minimis levels" as to both of the two critical ozone-producing pollutants and that the new flights would not undercut the state's implementation plan for air quality.

As for surface traffic, the FAA found that none of the flights would affect peak morning traffic and only one would affect peak evening traffic.  Estimating that each flight would generate 70 additional vehicle trips, it concluded that, at

_____

[6]These noise contour lines demarcate the land area enclosed within a particular level of noise, measured in "day-night average sound level" ("DNL") units, which represent the average decibel level at a particular location over a 24-hour period.

-19-

worst, the peak evening flight would increase traffic at several intersections on Route 2A by only about 2.65 percent, which the FAA deemed minimal and within the GEIR projection already found to be tolerable. As for noise increase, it found that the increased traffic volume would raise the peak level by less than 0.3 dB, "which is not a perceptible increase." See 23 C.F.R. § 771.135(p)(5)(iii) (2001).

Remarkably, in their lengthy submissions, petitioners make no direct attack on the aircraft noise or air pollution conclusions. Petitioners say only that any reliance on the GEIR was "inappropriate" because it was prepared for "unrelated" operations and is out of date. But in fact, the FAA verified the GEIR's accuracy by finding that the actual growth at Hanscom as of 1999 coincided almost exactly with the GEIR "modest growth" scenario whose environmental effects had already been considered.

The FAA's surface traffic analysis gets more attention, but even here their discussion is limited to a few pages and is confined to three brands of criticism: highly general claims that the agency's analysis is inadequate (e.g., that the FAA should have discussed non-peak hour traffic or other intersections); criticisms of the agency's factual assumptions (e.g., that the FAA underestimated the number of vehicle trips

-20-

that each passenger would take); or abstract statements of disagreement by other entities (<u>e.g.</u>, claims by the National Park Service that increased traffic would have "serious detrimental impacts").

Under settled doctrine, the FAA's factual findings are conclusive if supported by substantial evidence, 49 U.S.C. § 46110(c), and its reasoning is tested for reasonableness under an arbitrary and capricious standard. 5 U.S.C. § 706(2)(A); <u>Penobscot Air Servs., Ltd.</u> v. <u>Fed. Aviation Admin.</u>, 164 F.3d 713, 718-20 (1st Cir. 1999). Further, it is up to those who assail its findings or reasoning to identify the defects in evidence and the faults in reasoning. <u>Lomak Petroleum, Inc.</u> v. <u>Fed. Energy Reg. Comm'n</u>, 206 F.3d 1193, 1198 (D.C. Cir. 2000).

Where the agency is dealing with a very complicated and technical subject, this takes a lot of work by lawyers in culling the record and organizing the information for the reviewing court, but it can be done. Here, the FAA's final assessment--that a tiny percentage increase in flights would have a <u>de</u> <u>minimis</u> effect--is presumptively inviting but, in principle, can be overcome by a sustained and organized rebuttal. Nothing offered by petitioners approaches such an effort. Gauzy generalizations and pin-prick criticisms, in the

face of specific findings and a plausible result, are not even a start at a serious assault.

There is one obvious concern, and it is not about the impact of _this_ extremely modest increase in Shuttle America flights. Conceivably, Shuttle America or another airline could appear with a succession of new-destination proposals, each modest in size and in impact; and yet the cumulative effect of the FAA approvals could be major even though no one approval was significant in itself. Either a clear plan for such successive steps or proof that such a succession was foreseeable could conceivably require an overall prospective assessment. 40 C.F.R. §§ 1508.4, 1508.27(b)(7) (2000).

But we are not faced with any such developed claim in this case, nor do the known facts suggest any such thing. At the time of Shuttle America's application, commercial service at Hanscom had been a repeated failure, and there was no reason to believe, at that point, that demand would dramatically increase. Now, Shuttle America has reduced its operations and is under the protection of the bankruptcy court. If Shuttle America or other airlines undertake a series of proposed expansions, it will be time enough to consider whether new and projected activities need to be considered together.

Petitioners say that even if the minimal effects finding stands, the FAA's own regulations still required at least an environmental assessment under NEPA because the proposed action was "highly controversial on environmental grounds." FAA Order 1050.1D ¶ 32(b). The FAA's regulations, read literally, indicate that this test is met if the "action" in question is "opposed on environmental grounds by a Federal, State, or local government agency or by a substantial number of the persons affected." FAA Order 1050.1D, ¶ 17. Although the federal and state agencies did not formally oppose the LaGuardia flights (instead simply asking for more study), the four adjoining towns flatly opposed the new flights.

Citing a number of cases, the FAA argues that whether a project is environmentally controversial does not depend on whether vocal opponents exist but on whether reasonable disagreement exists over the project's risk of causing environmental harm. See, e.g., Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric., 681 F.2d 1172, 1182 (9th Cir. 1982). Otherwise, says the FAA, projects could be bogged down by a "heckler's veto" despite the lack of a genuine environmental threat. The FAA says that its own assessment here that the project is not objectively controversial is entitled to deference.

The FAA's approach certainly makes sense on policy grounds, but it is in some tension with the wording of its own regulation, which seems to make official opposition to the proposed "action" the trigger. By contrast, the decisions on which the FAA relies interpret "controversial" as used in other regulations, where the term modifies "effects"--phrasing more helpful to the FAA's reading. See, e.g., id. (interpreting 40 C.F.R. § 1508.27(b)(4)).

We need not decide whether the latitude allowed to the agency in interpreting its own regulations, see Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994), stretches to a reading that may make policy sense but appears at odds with the language. (Certainly the FAA might wish expressly to clarify its language for future cases.) Rather, we think that even if the "controversial" action regulation is read in petitioners' favor, it makes no sense to remand for an environmental assessment where, as here, the FAA has already made a reasoned finding that the environmental effects are de minimis. In a nutshell, the failure to make a more formal assessment was harmless error.

The doctrine of harmless error is as much a part of judicial review of administrative action as of appellate review of trial court judgments. Indeed, the Administrative Procedure

-24-

Act, 5 U.S.C. § 706, says that in reviewing agency action, the court "shall" take due account of "the rule of prejudicial error," i.e., whether the error caused actual prejudice. And while many of the decisions involve harmless substantive mistakes, no less an authority than Judge Friendly has applied the harmless error rule to procedural error, as has the circuit that most often reviews agency action.[7]

Obviously, a court must be cautious in assuming that the result would be the same if an error, procedural or substantive, had not occurred, and there may be some errors too fundamental to disregard. But even in criminal cases involving constitutional error, courts may ordinarily conclude that an admitted and fully preserved error was "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). Agency missteps too may be disregarded where it is clear that a remand "would accomplish nothing beyond further expense and delay." Kerner, 340 F.2d at 740.

---

[7]Kerner v. Celebrezze, 340 F.2d 736, 740 (2d Cir. 1965) (Friendly, J.). See also Steel Mfrs. Ass'n v. EPA, 27 F.3d 642, 649 (D.C. Cir. 1994) (failure to allow comment in hazardous waste standard case was harmless error); Illinois Commerce Comm'n v. ICC, 848 F.2d 1246, 1257 (D.C. Cir. 1988) (order to prepare an environmental assessment or an EIS would be "a meaningless gesture"); Gerber v. Babbitt, 146 F. Supp. 2d 1, 4-5 (D.D.C. 2001) (failure in NEPA case to make site location and map public was harmless procedural error).

We will assume that an environmental assessment and finding of no significant impact might look somewhat different in form and follow somewhat more complicated procedures than the study and findings by the FAA in this case. See generally 40 C.F.R. §§ 1501.4, 1508.9, 1508.13 (2000). But this case does not involve a simple refusal to study environmentally problematic consequences. On the contrary, even though only seven to ten flights a day are realistically at issue, the FAA examined each of the three principal possible negative effects and found each to be de minimis, and petitioners have provided no basis for serious doubt about those findings.

Under these circumstances, the presence of "controversy" is beside the point. Ultimately, the entire NEPA process is designed to make certain that significant negative effects are taken into account. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348-50 (1989). Remanding for a differently named assessment, where the project's negative consequences have already been analyzed and found to be absent and the findings have been disclosed to interested parties, is a waste of time. If there was error in denominating the assessment, it was patently harmless.

The same is true of petitioners' argument that the FAA committed a procedural error by failing to consult adequately

-26-

with the Massachusetts Historical Commission.  As already noted, NHPA imposes an obligation not only to take account of adverse effects of an "undertaking" on historic properties but also to permit the federal Advisory Council a "reasonable opportunity to comment."   This might sound like an obligation easily discharged, but that is far from the case.

On the contrary, the Advisory Council's regulations, once they are triggered, impose a complex consultative process. See generally 36 C.F.R Part 800 (2000).  Although the choice whether to approve the undertaking ultimately remains with the agency, it must consult with the state historic preservation officer--here, the Massachusetts Historical Commission--and other "consulting parties" about adverse effects on historic properties, document any no- effect finding, and submit the effects issue to binding review by the Advisory Council if the state officer and the federal agency disagree.  36 C.F.R. §§ 800.4, 800.5 (2000).  If adverse effects are established, even more complex steps are entailed.[8]

---

[8]Assuming an adverse effect is found, the agency must consult with the state officer and other consulting parties to develop and evaluate mitigation measures.  36 C.F.R. § 800.6 (2000).  The process is then completed either by a "memorandum of agreement" between the agency and the consulting parties, which then governs the federal undertaking, 16 U.S.C. § 470h-2(l), or by termination of the consultation by the agency followed by the issuance of formal comments by the Advisory Council, 36 C.F.R. § 800.7 (2000).

Understandably, agencies are loath to submit to this cumbersome process, and the NHPA regulation in effect at the time the FAA acted contained a categorical exemption from the consultation process where "the undertaking does not have the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a)(1) (2000). No consultation was required for this decision. 64 Fed. Reg. 27,063 (1999). The FAA found that the LaGuardia flights had no such potential and, after some consultation with the state officer, discontinued the process, relying on the regulation's exemption.

As already explained, petitioners make nothing close to a colorable attack on the FAA's finding that the ten or fewer LaGuardia flights in question would not adversely affect nearby historic sites in any substantial way. Nevertheless, petitioners argue that under section 800.3(a)(1) of the regulations, it is enough to trigger the consultation process that the FAA action is a "type of activity"--a change in operating specifications--that in some other case could have a potential adverse affect.

The main support for this reading comes from the language in the overarching paragraph (section 800.3(a)) and the Advisory Council's amendment of section 800.3(a)(1) following the FAA decision in this case, 65 Fed. Reg. 77,698, 77,726 (Dec.

-28-

12, 2000), both of which employ the "type of activity" language.[9] The Advisory Council claims that the amendment reflects what the regulation always meant.  Although it is not the most natural reading of the original regulation, a definitive judgment as to meaning would have to allow some deference to an agency's clarification.  See Thomas Jefferson Univ. 512 U.S. at 512.

At the same time, the current regulation could make the exemption useless to the FAA--at least, if the FAA continues to view "operating specifications" as the category to which "type" refers.  One could easily think of some change in operating specifications--as to equipment, frequency or other variables-- that could have a significant environmental effect.  Of course, the current regulation does not define the notion of a "type"; conceivably, the FAA could still distinguish among "types" of

---

[9]Prior to the amendment, 36 C.F.R. § 800.3(a) (2000) read as follows:

> (a) The Agency Official shall determine whether the proposed Federal action is an undertaking . . . and, if so, whether it is a type of activity that has the potential to cause effects on historic properties. . . .
> (1) If the undertaking does not have the potential to cause effects on historic properties, the Agency Official has no further obligations under section 106.

The amendment changed section 800.3(a)(1) to read "If the undertaking is a type of activity that does not have the potential to cause effects on historic properties. . . ."  65 Fed. Reg. 77,698, 77,728 (Dec. 12, 2000).

amendments so as to preserve some role for the categorical exception.

We need not resolve any of these questions. The consultative process under NHPA, like the process of creating an EIS or environmental assessment under NEPA, is intended in the end to identify and measure the adverse effects of a proposed action on a protected interest (historic properties for NHPA, the environment for NEPA) so that those effects can be considered by the responsible agency.

Here, the FAA did make specific findings that the effects on the environment and on historic properties from ten or so daily flights, against the backdrop of nearly 100,000 flights a year, would be de minimis. If the question were at all close and if plausible doubts had been raised, requiring a more elaborate assessment with more extensive consultation might serve some useful purpose. But neither is the case and, in these circumstances, the error (if there was one) is harmless.

The petition for review is denied.