LYNCH, Circuit Judge
(Dissenting).
Despite my respect for my colleagues, I dissent. By any definition the Secretary has engaged in “consultation”: he sought comments from the Council on the very point at issue (a possible rule based on historic participation), received them ip writing, and responded in writing. The majority says this exchange does not count because the Secretary did so in the course of receiving public comments on a draft Environmental Impact Statement (DEIS) under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370 (2000). The majority argues that if this did count as consultation, that would make the separate consultation requirement of 16 U.S.C. § 5103(b)(1) (2000) redundant, and Congress does not enact superfluous provisions. With respect, the majority is, in my view, quite wrong in its ruling on statutory interpretation.
The majority also argues that even if there were no redundancy, further consultation is required, but does not say why. In fact, the two statutes cover similar concerns — including both economic and environmental considerations — and there is no need for further consultation.
Moreover, even if the majority’s statutory interpretation is correct, there is still the question of whether the plaintiffs have demonstrated prejudicial error under 5 U.S.C. § 706 (2000) or are entitled to any relief. The district court should address these issues on remand.
I.
The majority holds that the Secretary cannot meet his obligation to consult with the New England Council under § 5103(b)(1) by giving notice of proposed alternative approaches to the lobster overfishing problem to the Council, receiving commentary from the Council, and responding to those comments because he did so in the course of meeting NEPA *122 requirements. The majority reaches this holding because it believes that the consultation requirement would otherwise be rendered redundant. That is not so.
The majority’s reasoning necessarily rests on the premise that in all situations the consultation requirement of § 5103(b)(1) would be rendered redundant if an agency could be said to have consulted under ACFCMA by complying with the notice and comment requirements under NEPA for a DEIS. That premise — that the universe of regulation under ACFCMA and NEPA are perfectly congruent, like circles atop each other — is fallacious, as shown below. - In many circumstances there is no overlap and no possible redundancy.
ACFCMA, 16 U.S.C. §§ 5101-5108 (2000), authorizes the Atlantic States Marine Fisheries Commission to develop coastal management plans. Id. § 5104(a). Plans adopted by the Commission may not be implemented by the Secretary until “after consultation with the appropriate Councils.” Id. § 5103(b)(1). The strictures of NEPA require that a federal agency issue an environmental impact statement (EIS) only for “major Federal actions significantly affecting the quality of the human environment.” 42 U.S.C. § 4332(C) (2000). If the proposed action would not have a significant effect on the environment, the agency need not produce an EIS. See 40 C.F.R. §§ 1501.4(e), 1508.9(a)(1) (2001).
Given that there was a separate requirement of notice and opportunity to comment under NEPA, it is fair to ask why Congress imposed a consultation requirement in ACFCMA. The most plausible reading is that Congress wished to assure that if consultation did not occur in the process of meeting other regulatory requirements, there would be consultation with the councils in any event. The consultation requirement is a fail-safe.
There may well be situations in which that fail-safe is needed. The majority itself notes one such situation: when the DEIS does not cover the subject matter of the proposed regulation on which there should be consultation with the council. The majority thus refutes its own logic, which rests on a claim of redundancy. Another example is when the Secretary’s proposed regulation does not require issuance of a DEIS, because the regulation would not have a significant effect on the environment. A third is when the Secretary does not, in the course of the DEIS, give specific notice to the councils and they, ignorant of the opportunity, do not comment. The circles of regulatory scope of ACFCMA and NEPA do not sit atop each other, but instead constitute a Venn diagram, with only partial overlap. The lack of contiguity between the regulatory schemes eliminates the redundancy argument upon which the entire logic of the majority opinion rests.
Furthermore, that portions of the NEPA and ACFCMA regulatory regimes may overlap does not create an objectionable redundancy. A great many systems have redundancy built in, just to provide an additional fail-safe. No one considers those redundant systems to be superfluous; they are there for a purpose.
Rather, it is the majority’s opinion which will create a duplication of effort which is contrary to congressional intent. Congress surely prefers agencies to be efficient and avoid unnecessary procedural steps. That is the thrust of the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 (2000), among many other laws. See, e.g., Paperwork Reduction Act of 1995, 44 U.S.C. §§ 3501-3521 (2000). Congress also prefers, as NEPA itself says, that the agencies try to coordinate and administer *123 in a coherent fashion their various environmental responsibilities. See 42 U.S.C. § 4332. Yet the majority opinion holds that the Secretary must meet his obligation to consult with the New England Council about the best way to protect lobsters and the lobster fishery in a separate procedure totally apart from the public procedure of DEIS comments on the possible alternative solutions to the very same problem of lobster overfishing. On these facts, the majority’s requirement that there be a separate procedure of consultation creates redundancy, inefficiency, and delay. See Coalition for Lower Beaufort County v. Alexander, 434 F.Supp. 293, 295 (D.D.C.1977) (NEPA “was not intended to create a bureaucratic nightmare in which form rather than substance governs”).
That is a bad outcome in any situation. It is a particularly bad outcome where Congress has specifically retooled regulation in the area of fisheries through ACFCMA, taking power away from the councils in order to make the regulatory system speedier and more efficient. Further detail on this regulatory background is set forth as Appendix A. And even worse, the majority’s outcome introduces delay into the very process Congress tried to place on a fast track: the protection of the lobster fishery.[16]
The statute does not, contrary to the majority, prohibit the Secretary from complying with the consultation requirement of ACFCMA and the notice and hearing requirements of NEPA at the same time. Congress would applaud such initiative. The agency here did not engage in empty formalisms. It specifically sent the various regulatory options to the Council, received pertinent comments, and responded to them. The historic participation model for trap limits, the very plan plaintiffs now claim was not the subject of consultation, was among the alternatives included in the DEIS. This communication satisfied the policy concerns behind both ACFCMA’s consultation requirement and NEPA’s EIS requirement.
The majority, in footnote nine, attempts to avoid the weakness of its redundancy logic by saying that it does not really rely on redundancy, but that the requirements of ACFCMA and NEPA could not be handled together because “some additional consultation was required.” The majority does not explain why. It certainly cannot be that there was no opportunity for the Council to comment on material issues during the course of its NEPA response. First, § 5103(b)(1) does not require that the Secretary consult with the councils on particular specific matters. In fact, under § 5103(b), the only requirement for valid consultation is that it occur before the regulation in question is implemented. Second, the majority may mistakenly assume in footnote nine, without any analysis, that there was no consultation on the economic impact of the purported regulation. This, in turn, rests on the erroneous assumptions that: (a) NEPA commentary does not address economic impact, and (b) NEPA commentators are precluded from discussing economic impact. Both assumptions are wrong as a matter of law. Both assumptions are factually untrue.
*124 The purpose of the EIS under NEPA is very similar to the purpose of the ACFC-MA consultation requirement: “[T]he EIS helps ... to ensure that the agency takes a ‘hard look’ at the environmental consequences of its proposed action and to make information on the environmental consequences available to the public, which may then offer its insight to assist the agency’s decision-making through the comment process.” Dubois v. United States Dept. of Agric., 102 F.3d 1273, 1285-86 (1st Cir.1996). Where the policies promoted by the requirements under ACFCMA and NEPA — “consultation” and “notice and comment” — are so similar, it makes sense for the agency to handle them together. Moreover, the path the agency took had the added benefit that the public could see the Council’s comments and the Secretary’s response. There was no “consultation” behind closed doors or at an obscure meeting.
While one purpose of NEPA and its EIS requirements is environmental protection, another is to strike a balance between that protection and economic productivity. See 42 U.S.C. § 4321 (describing the purposes of NEPA as including “encouraging] productive and enjoyable harmony between man and his environment”). Similarly, environmental impact statements must address “the relationship between local short-term uses of man’s environment and the maintenance and enhancement of long-term productivity.” § 4332(C)(iv). In short, the nature of NEPA’s provisions addresses economic as well as environmental factors.
Here, as a matter of fact, the Council was on notice that the lobster fishery DEIS and request for comments put economic considerations on the table. The DEIS issued by the agency, in its opening paragraphs, made this clear: “The DEIS considers the biological and economic effects of several alternative actions for waters under federal jurisdiction” (emphasis added).
Even had the DEIS not made the breadth of issues open for comment so explicit, there is no restriction on the subject matter or content of comments made to an agency issuing an EIS. The Council was free to respond to the DEIS however it wished. Further economic concerns were relevant in the response.
The majority attempts to justify its result by saying that it is required by the plain meaning of the statute. That is a red herring. The majority’s reasoning rests not on plain meaning but on a supposed redundancy between two statutes (a redundancy that does not exist) or a supposed preclusion of economic commentary (a preclusion that does not exist).
Even if plain meaning were somehow at issue, the disagreement really is not about a dictionary definition of “consultation.” The dispute is about which of the very many ways there are of eliciting the views of others amounts to the sort of “consultation” Congress intended. On this point, there is ambiguity and the statute does not tell us the answer.
The statutory text containing the “consultation” requirement is clear in certain respects. It is clear that the “consultation” need take place only before “implementation” of the regulation; section 5103(b)(1) imposes no other constraints on when consultation can take place. Any consultation between the agency and the councils on the subject addressed by the proposed regulations would meet the strictures of § 5103(b)(1), then, even if that consultation took place before formal notice of the proposed rule. The long-running communication between the Secretary and the Council, summarized in Appendix B, demonstrates just this sort of pre-im-plementation consultation.
*125 The statute is also clear that there is no separate notice provision requiring that the Secretary announce that he is “consulting” with the councils or that the councils be informed of exactly how the Secretary plans to meet the consultation requirement. Courts are not free to engraft additional procedural requirements Onto § 5103(b)(1) when Congress has not done so. Cf. Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 545, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (prohibiting judicial additions to the procedural requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706 (2000)). By creating a requirement that the agency give separate notice to the councils that the DEIS comment period is meant to meet the parallel ACFCMA consultation requirement as well, the majority makes precisely this error.
When analyzing similar, though not identical, language in other statutes that are designed to produce informed decision-making, this court has required only that the agency be informed of and consider various alternatives or positions. In our NEPA decisions this court has said that the court’s substantive role is “only to assure itself that the agency has given good faith consideration to the environmental consequences of its actions and should not pass judgment on the balance struck by the agency among competing concerns.” Roosevelt Campobello Int’l Park Comm’n v. United States Envtl. Prot. Agency, 684 F.2d 1041, 1045 (1st Cir.1982); see Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); see also Save Our Heritage, Inc. v. Fed. Aviation Admin., 269 F.3d 49, 58 (1st Cir.2001) (the National Historic Preservation Act (NHPA) “imposes both a substantive obligation to weigh effects ... and a procedural obligation to consult”); Dubois, 102 F.3d at 1284 (“ ‘NEPA does not mandate particular results’; it ‘simply prescribes the necessary process.’ ”) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)); Robertson, 490 U.S. at 350, 109 S.Ct. 1835 (“If the adverse environmental effects ... are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.”); Vermont Yankee, 435 U.S. at 558, 98 S.Ct. 1197 (Congress, in enacting NEPA, meant only “to insure a fully informed and well-considered decision”). The analogous additional procedural requirements of ACFCMA, then, are designed only to ensure that an agency takes particular factors into consideration when making decisions. That has surely been done here.
Finally, for two different reasons, at least some deference is owed to the agency’s view that it has engaged in consultation. First, Congress has left it to the Secretary to reasonably construe “consultation.” ACFCMA on this point is in contrast with NHPA, 16 U.S.C. § 407f. Under NHPA, Congress empowered the Advisory Council on Historic Preservation to promulgate rigorous procedural rules governing the consultation process. Id. § 470s. The actual consultation process under NHPA has not been left up to the individual agencies but has been codified by regulation. 36 C.F.R. Part 800 (2001). Here, by contrast, the regional councils have not been given any formal power to determine the structure or content of the consultation process. Given the counterexample of NHPA and Congress’s choice not to pursue a similar path under ACFCMA in § 5103(b)(1), Congress apparently intended that the Secretary here be permitted to determine the appropriate consultation procedures (subject to *126 the underlying APA constraint that the interpretation not.be arbitrary and capricious).
Deference is also owed agencies due to their “specialized experience.” Skidmore v. Swift & Co., 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944); see United States v. Mead Corp., 533 U.S. 218, 234-39, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (applying Skidmore deference). The consultation requirement of § 5103(b)(1) is not a generalized procedural hurdle; it requires that the Secretary consult with a particular set of organizations with which the agency is intimately familiar. The Secretary was presumably aware of how best to consult with the regional councils regarding fishery regulation. He consulted with the New England Council over a period of many years, as described in Appendix B, and we should accept his entirely reasonable determination that this consultation was adequate under ACFCMA.
The Secretary’s regulation of the lobster fishery is taking place on two tracks, one slightly in advance of the other. In addition to the rule now being challenged, the Secretary has proposed, received comments on, but not yet adopted a new replacement rule which follows the historic participation model for setting trap limits. See American Lobster Fishery, 67 Fed. Reg. 282 (proposed Jan. 3, 2002) (to be codified at 50 C.F.R. Part 697); see also Extension of Comment Period, 67 Fed. Reg. 4697 (Jan. 31, 2002) (extending comment period on proposed historic participation rule until Feb. 28, 2002). This is the model that plaintiffs in the present case prefer. The proposed rule should be made final soon, the comment period having closed over seven months ago. The Secretary’s version of a historic participation model works out many technical details that were incomplete when the rule challenged in this litigation was proposed. The consideration of this proposed rule again shows that consultation took place and the Council’s concerns were heard. Presumably implementation of a historic participation rule will moot this appeal.
II.
This court has discretion to determine the harmlessness of the error, although neither side has briefed the issue to us. United States v. Shea, 159 F.3d 37, 40 (1st Cir.1998) (harmlessness can be raised sua sponte); United States v. Rose, 104 F.3d 1408, 1414 (1st Cir.1997) (same); see Save Our Heritage, 269 F.3d at 61 (applying harmless error sua sponte in an administrative review context); Moulton v. Rival Co., 116 F.3d 22, 26 (1st Cir.1997) (applying harmless error analysis in a civil context). The majority opinion chooses not to exercise that discretion, preferring to remand the issue to the district court.
Some reference to the common standards in the area may be of assistance on remand. Judicial review of agency rule-making is not directly analogous to judicial review of an agency adjudication:
A judicial determination that an agency erred in the process of adopting a new policy does not necessarily mean that the status quo ante — the agency’s old policy — is superior to the agency’s new policy. Frequently, the basis for setting aside the new policy is remote from the central purpose and basis of the new policy. Yet, judicial review of the agency rulemaking process is so demanding that the process of policymaking on remand from a court decision reversing an agency decision usually requires many years. If the new policy is superior to the old policy, the public can suffer significant harm attributable to the years of delay.
1 R.J. Pierce Jr., Administrative Law Treatise, § 7.13 (4th ed.2002).
*127 This is one reason that the APA instructs a reviewing court to consider whether the alleged error caused actual prejudice. See 5 U.S.C. § 706 (mandating that when a court reviews an agency action, “due account shall be taken of the rule of prejudicial error”). The burden is on the plaintiffs to show such prejudice. See Air Canada v. Dep’t of Transp., 148 F.8d 1142, 1156 (D.C.Cir.1998); see also Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 102 (1st Cir.1997) (“In a civil case, the party asserting error bears the burden of demonstrating that the error was harmful....”).
Our court and others have interpreted this APA requirement as a harmless error rule, and have refused to grant relief when a procedural error in the regulatory process (or an alleged one) did not produce a different result for the plaintiff. See, e.g., Save Our Heritage, 269 F.3d at 61-63 (finding agency’s alleged failure to consult under NHPA was harmless error where impact on historic site was de minimis); First Am. Discount Corp. v. Commodity Futures Trading Comm’n, 222 F.3d 1008, 1015-16 (D.C.Cir.2000) (holding failure to provide notice and seek comments on alternative compliance mechanism was harmless error where plaintiff had invoked that mechanism); Sierra Club v. Slater, 120 F.3d 623, 637 (6th Cir.1997) (finding error in notice harmless because a “notice requirement was functionally satisfied” through other means).
Further, even if the Secretary had erred by failing to consult and even if the error were prejudicial to plaintiffs, that still would not lead to vacating the regulation. It is in the reviewing court’s sound discretion to remand a rule to an agency to mend procedural defects without overturning it in its entirety. See Cent. Me. Power Co. v. Fed. Energy Regulatory Comm’n, 252 F.3d 34, 48 (1st Cir.2001) (declining to enjoin regulation while case remanded to agency for further explanation); Sugar Cane Growers Coop, of Fla. v. Veneman, 289 F.3d 89, 98 (D.C.Cir.2002) (remanding rule that violated notice and comment requirements without vacating it because of chaotic practical consequences of vacating); United Mine Workers v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 967 (D.C.Cir.1990) (“Relevant to the choice are the seriousness of the order’s deficiencies ... and the disruptive consequences of an interim change that may itself be changed.”).
The district court should also consider this issue on remand.
III.
Because I differ with the majority’s holding, I respectfully dissent.

Appendix A: Background

A. Statutory Context
The Secretary’s regulation of federal waters is meant to be done in coordination with the states’ regulation of their own coastal waters. The original model was one established by the Magnuson-Stevens Act. 16 U.S.C. §§ 1801-1883 (2000). That statute, first enacted in 1976, see Fishery Management and Conservation Act, Pub.L. No. 94-265, 90 Stat. 331 (1976), established eight regional councils, including the New England Council, composed of representatives of various stakeholders, such as state regulators, industry, environmentalists, and academics. Id. § 1852(a)(1). The Magnuson-Stevens regime established a complex relationship between the Secretary and the regional councils which afforded the latter considerable power. For example, while it was the Secretary who determined that a particular aquatic species needed conservation measures to stop overfishing, it was the *128 council that then developed the fishery management plan (FMP) in response, which the Secretary, through his designee the National Marine Fisheries Service (NMFS), either approved or disapproved. Id. § 1852(h). Not surprisingly, this process was cumbersome and diffused authority too much.
In response, Congress enacted the Atlantic Coastal Fisheries Cooperative Management Act (ACFCMA) in 1993. Pub.L. No. 103-206, Title VIII, §§ 801-811, 107 Stat. 2419, 2447 (1993). It is that statute which we interpret. The ACFCMA relied on the Atlantic States Marine Fisheries Commission (“Atlantic States Commission” or “Commission”), an organization more closely controlled by state governments, to play a more active role in the process of developing regulation over fisheries in federal waters.[17] See 16 U.S.C. § 5101(a)(4). According to the Secretary, some members of the New England Council also sit on the Atlantic States Commission.
Under the ACFCMA, the Atlantic States Commission now develops its own management plans for Atlantic waters, called coastal management plans (CMPs), which are distinct from the FMPs developed by regional councils. See 16 U.S.C. § 5104(a)(1) (authorizing Atlantic States Commission to “prepare and adopt coastal fisheries management plans to provide for the conservation of coastal fisheries resources”). In preparing a CMP, the Atlantic States Commission in turn consults with the appropriate regional councils. Id. The statute did not disband the regional councils on the east coast, but it did reduce their power over regulation in the EEZ. The Secretary now has the authority to work principally through the Commission when developing new regulations for the EEZ. See 16 U.S.C. § 5103. The regulations promulgated under that authority are subject to the conditions that give rise to the disputes in this case.
B. Regulatory Process Leading to the Challenged Rule
The regulatory process which resulted in the challenged regulations took a period of. years; we view it as starting before 1995. The need for more aggressive action to preserve the Atlantic lobster fishery has been evident since at least 1993, when a report revealed that the American lobster stock was overfished.[18] That finding was reinforced by a lobster stock assessment in 1996. On September 30, 1997, the NMFS placed the American lobster on a list of overfished fisheries.
Prior to that, in July of 1995, the New England Council had corresponded with the NMFS and various states, attempting to get all to agree in concept, before there were any public hearings about it, to the lobster management strategy developed by the Council’s Effort Management Teams (EMTs). The NMFS responded that the staff of the two groups had already been involved together in the development of lobster management plans by EMTs, that *129 many of the states had declined to participate in the Council’s proposed process, and that the agency would therefore consider using its power under ACFCMA and withdrawing the New England Council’s lobster FMP.
The Secretary then published an advance notice of proposed rulemaking (ANPR), indicating that NMFS was considering such a process under the ACFCMA and asking for comments. See Advance Notice of Proposed Rulemaking, 60 Fed.Reg. 48,086 (Sept. 18, 1995). The ANPR explained that acting under ACFC-MA “would remove management responsibility for the lobster fishery from the [New England] Council’s purview,” although the resulting regulations could incorporate ideas from the Council’s EMT plans. One affected state responded that it preferred the rulemaking to be transferred to the Atlantic States Commission from the New England Council. On February 23, 1996, the NMFS informed the New England Council in a letter that it intended to shift rulemaking for the American lobster in the EEZ to the Atlantic States Commission, and that it would encourage the Commission to come up with a more definite lobster fisheries plan. A month later, the NMFS announced its initial determination that it would withdraw approval of the New England Council’s FMP for American lobster and, in order to see that the fishery more closely complied with state administrative programs, issue regulations formulated through the Atlantic States Commission under ACFCMA. See American Lobster Fishery; Removal of Regulations, 61 Fed.Reg. 13,478 (Mar. 27, 1996).
In September 1996, Congress passed fisheries legislation that established new general procedures for the revocation of an FMP, but which recognized the urgency of the lobster overfishing problem by making it easier for the Secretary to withdraw approval of the lobster FMP. The new provision exempted only the lobster FMP, by name, from the new requirements. See Sustainable Fisheries Act of 1996, Pub.L. No. 104-297, § 109(i), 110 Stat. 3587 (1996). This congressional action advanced the Secretary’s goal of transferring authority over lobster management from the Council to the Commission.
Prompted by the Secretary’s actions, the Atlantic States Commission began to develop a plan for the conservation of the American lobster fishery. In December 1997, the Commission approved Amendment 3 to its Interstate Fishery Management Plan. The Amendment established an advisory group (the Lobster Conservation Management Team or “LCMT”), including plaintiff Campanale and Sons, Inc. (“Cam-panale”) and other industry representatives, to recommend a lobster management plan based on historic participation. Amendment 3 also included a uniform limit of 2000 traps as a default measure that would take effect unless the LCMT came up with an alternate plan by certain deadlines.
In furtherance of Amendment 3, on March 17, 1998 NMFS issued a draft environmental impact statement (“DEIS”) pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370 (2000). The DEIS sought to evaluate alternative management measures for federal waters that would be compatible with the measures developed under Amendment 3. Among the alternatives, the DEIS expressly considered: maintaining the status quo (Alternative 1); implementing Amendment 3’s default limitation of 2000 traps (Alternative 2); implementing a nearshore/offshore trap cap differential, with a buffer zone, and continuing existing management measures (Alternative 3); a two-tier nearshore and offshore trap limit *130 with a buffer zone (Alternative 4); near-shore uniform trap limits and offshore limits set by historic participation (Alternative 5); and banning fishing for and possession of lobsters (Alternative 6). As required under NEPA, NMFS requested public comments on the alternatives set forth in the DEIS. See Council on Environmental Quality NEPA Regulations, 40 C.F.R. Pts. 1502,1503 (2002) (explaining EIS and public comment process). A number of public hearings were also held on the DEIS in the various states that participate in the lobster fishery.
The New England Council was specifically sent the DEIS so that it could comment. The DEIS also itself referred to prior interactions between NMFS and the New England Council on the matter. The DEIS noted that the New England Council, when it was revising its FMP, had missed the deadline for adopting a plan and had not reached a “final agreement” on specific measures to prevent lobster overfishing. The New England Council did respond to the DEIS and indicated its support for an alternative based on historic participation rather than a uniform flat trap limit.
On May 10, 1999, the Secretary issued a Final Environmental Impact Statement (FEIS), which reflected comments that had been received, including those from the New England Council. The Council had commented that in selected management areas it supported a historic participation trap limit. The Secretary responded that this approach had also been proposed through the LCMT as part of the Commission’s deliberations and was the specific subject of hearings to be held by the Commission in May of 1999. The response also supported an industry-wide evaluation - by the Commission “on the merits of historic participation.”
The LCMT and the Atlantic States Commission did not meet the deadlines set in Amendment 3 for development of the historic participation rule. That, in turn, created an obligation for the Secretary to come up with at least an interim rule. The flat trap limit rule that was adopted, and is the subject of this lawsuit, was compatible with the default limit of 2000 traps set by the Commission in Amendment 3.
The Secretary proposed the challenged rule in January 1999. At that time the Commission still had not completed a viable historic participation rule. The Secretary delayed publication of a final rule, giving the Atlantic States Commission yet more time to act. The Secretary finally promulgated the rule, implementing a flat trap limit consistent with the Commission’s default measure, in December 1999. See American Lobster Fishery, 64 Fed.Reg. 68,228 (Dec. 6, 1999) (to be codified at 50 C.F.R. Part 697).

Appendix B: Secretary’s “Consultation” Actions

Arguing that he did consult, the Secretary points to a number of documents (including documents which reflect staff level communication between the Secretary and the New England Council), to the comments submitted by the New England Council in response to the DEIS, and finally to the involvement of the Atlantic States Commission, on which members of the regional councils sit. Taken together, these interactions satisfied the “consultation” requirement of § 5103(b)(1), as the Secretary contends:
1). A 1994 letter from NMFS to the New England Council concerning approval and disapproval of some FMP amendments that the Council had proposed, and warning that the Secretary might withdraw approval of the FMP and promulgate new rules through the Atlantic States *131 Commission “under the Atlantic Coastal Act.”
2). Letters sent in July 1995 by the New England Council to state regulators and to the NMFS regional director, Andrew Rosenberg, seeking to get them all to agree in concept to the Council’s lobster strategy, based on the EMT plans, before public hearings about it that fall.
3). A response letter, dated August 9, 1995, from Rosenberg to the New England Council. Rosenberg says that NMFS staff had already been involved in development of the EMT plans, and had raised their “[Ilegal and enforcement concerns” in that process. He goes on to note the “recent letters from the states opting out of this cooperative effort” — apparently referring to state regulators’ responses to the Council’s July 1995 inquiries. As a result, Rosenberg concludes, the NMFS “must now reevaluate its options which include amending the plan by Secretarial action or withdrawing the lobster FMP.” That is, the NMFS would need to consider either (1) imposing changes under the Magnu-son-Stevens Act, or (2) using the Secretary’s power under ACFCMA and withdrawing the FMP. (The second option is what the agency ultimately pursued).
4). A September 8, 1995 e-mail message from an NMFS official describing Rosenberg’s participation in an August 1995 meeting of the New England Council where he reiterated the contents of his letter.
5). The September 1995 ANPR announcing the proposal to withdraw the FMP and proceed under ACFCMA, as well as an internal NMFS memo by Rosenberg preparing for this notice.
6). A September 27, 1995 memo from Rosenberg concerning his participation in a September 1995 meeting of the New England Council about the timing of the lobster stock assessment.
7). An October 24, 1995 letter from the New England Council to Rosenberg. The letter accepts that it may be appropriate to develop a lobster plan with the Commission as “the lead fishery management institution” and the New England Council playing a supporting role in a “joint planning process.”
8). A letter dated February 23, 1996 from the Director of the NMFS to the New England Council, which informs the Council that the NMFS plans to publish a proposed rule in the Federal Register withdrawing the lobster FMP and replacing it with regulations developed under ACFCMA in cooperation with the Commission.
9). The comments submitted by the New England Council in response to the DEIS, which are described in the FEIS and set forth in the main text of the dissent.
Some of this interaction cited by the Secretary occurred in 1995 and 1996, a few years before the challenged rule was proposed in January 1999. But the statute does not contain any requirement about when the consultation take place, other than that it must be before implementation of the rule. In fact, the earlier dialogue was an important part of a lengthy process of coming to a rule, a process which culminated in a proposed rule in 1999 and an implemented rule in 2000.

. In September 1996, Congress passed fisheries legislation that established new general procedures for the revocation of an FMP, but which recognized the urgency of the lobster overfishing problem. The new provision exempted only the lobster FMP, by name, from the new requirements. See Sustainable Fisheries Act of 1996, Pub.L. No. 104-297, § 109(1), 110 Stat. 3587, 3587 (1996). This congressional action advanced the Secretary's goal of transferring authority over lobster management from the Council to the Commission.

. The Atlantic States Commission was formed originally by a congressionally-ap-proved interstate compact in 1942. See Pub.L. No. 77-539, 56 Stat. 267 (1942). It is composed of three representatives from each state on the eastern seaboard (as well as the District of Columbia): a state legislator, the head of the state agency responsible for fishery management, and a gubernatorial nominee with "knowledge of and interest in the marine fisheries problem.” See id. at Art. III.

. Attempting to address the same lobster overfishing problem, the New England Council had also amended its FMP for the American lobster seven times from 1986 to 1999. The Secretary corresponded with the Council about the adequacy of these amendments.