# United States Court of Appeals
## For the First Circuit

Nos. 10-1664
     10-1668

UNITED STATES ET AL.,

Plaintiffs, Appellees,

v.

COALITION FOR BUZZARDS BAY ET AL.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Boudin, Selya and Howard, Circuit Judges.

Seth Schofield, Assistant Attorney General, with whom Martha Coakley, Attorney General, and Pierce O. Cray, Assistant Attorney General, were on brief, for appellants Commonwealth of Massachusetts et al.
Jonathan M. Ettinger, Elisabeth M. DeLisle, Amy E. Boyd, and Foley Hoag LLP on brief for intervenor-appellant Coalition for Buzzards Bay.
Philip N. Beauregard on brief for Towns of Bourne, Fairhaven, Falmouth, Gosnold, Marion, Mattapoisett, Rochester, Wareham, and Westport, and City of New Bedford, amici curiae.
Anisha S. Dasgupta, Attorney, Appellate Staff, Civil Division, United States Department of Justice, with whom Tony West, Assistant Attorney General, Carmen M. Ortiz, United States Attorney, and Mark

B. Stern, Attorney, Appellate Staff, were on brief, for federal appellees.

C. Jonathan Benner, with whom Jeffrey Orenstein and Reed Smith LLP were on brief, for intervenors-appellees American Waterways Operators et al.

_____

May 17, 2011

_____

**SELYA**, <u>**Circuit Judge**</u>. Buzzards Bay is a brilliant jewel in the diadem of Massachusetts waters. It comprises an inlet flowing landward from the Atlantic Ocean, thirty miles long and up to ten miles wide. Many people regard it as the gateway to Cape Cod.

The name "Buzzards Bay" is a fluke. Folklore has it that early settlers mistook an indigenous flight of ospreys for buzzards, and the rest is history.

The bay is not only a spectacularly beautiful natural resource but also a major channel of maritime commerce in southeastern Massachusetts. The combined environmental and commercial significance of the bay has sparked a pitched battle between federal and state sovereigns over the nature of preventative measures needed to safeguard against the risk of oil spills. These appeals mark the latest round in that battle.

The overarching question before us involves the Coast Guard's authority to promulgate regulations that preempt state environmental law with respect to tank vessels. But as the proverb teaches, there is many a slip twixt the cup and the lip. Discerning such a slip, we do not reach the preemption question but, rather, hold that, during the rulemaking process, the Coast Guard failed to comply with its obligations under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347. Inasmuch as this bevue was not harmless, we reverse the district court's

entry of summary judgment in favor of the Coast Guard, vacate the injunction against the enforcement of state law issued below, and remand for further proceedings.[1]

## I. BACKGROUND

This case had its genesis in a particularly regrettable maritime misfortune. On April 27, 2003, the Bouchard Barge-120 struck an outcropping of rocks, spilling an estimated 98,000 gallons of oil into Buzzards Bay. Bad things sometimes can lead to good things and, spurred by this incident, the state legislature enacted the Massachusetts Oil Spill Prevention Act (MOSPA), codified as amended primarily at Mass. Gen. Laws ch. 21, §§ 42, 50B-50E; ch. 21M, §§ 1-8. The federal government saw this as a threat to its power to regulate commercial shipping on Buzzards Bay and sued to abrogate certain provisions of the MOSPA. The suit asserted that the challenged provisions of the state statutory scheme were preempted by the Ports and Waterways Safety Act, Pub. L. No. 92-340, 86 Stat. 424, as amended by the Port and Tanker

---

[1] The parties to this litigation are numerous. The principal plaintiffs include the United States, the Coast Guard, and shipping industry representatives who have intervened on their behalf. The principal defendants are the Commonwealth of Massachusetts (the Commonwealth), various state officials and agencies, and the Coalition for Buzzards Bay, a nonprofit organization that has intervened to support the Commonwealth's position. An array of municipalities bordering Buzzards Bay appear as amici in support of the Commonwealth. Given this crowded field, we opt for simplicity and refer to the protagonists as the Coast Guard (a shorthand for the appellees, collectively) and the Commonwealth (a shorthand for the appellants, collectively).

Safety Act, Pub. L. No. 95-474, 92 Stat. 1471, codified at 33 U.S.C. §§ 1221-1232 and scattered sections of 46 U.S.C., and by Coast Guard regulations promulgated thereunder.

The district court (Tauro, J.) granted an injunction. United States v. Massachusetts, 440 F. Supp. 2d 24, 48 (D. Mass. 2006). The Commonwealth appealed, seeking to reinstate the MOSPA's manning and tug escort requirements for vessels. We vacated the injunction because the district court had not applied the correct analytical model for resolving federal-state regulatory conflicts. United States v. Massachusetts, 493 F.3d 1, 4-5 (1st Cir. 2007). The case was remanded for further development of the record. Id. at 4.

With the case pending before the district court, the Coast Guard changed the legal seascape by promulgating a final rule relating to navigation in Buzzards Bay (the 2007 Rule). This rule, unlike the version previously before this court, purported expressly to preempt the challenged provisions of the MOSPA. See 72 Fed. Reg. 50,052, 50,056-57 (Aug. 30, 2007). It established manning and escort requirements limited to Buzzards Bay. See id. at 50,052.

As part of the rulemaking process that culminated in the issuance of the 2007 Rule, the Coast Guard eschewed the preparation of either an environmental impact statement (EIS) or an environmental assessment (EA). It determined instead that its

proposed action fell within a categorical exclusion that obviated any such analysis.

There are material differences between the protections afforded by the MOSPA and those afforded by the 2007 Rule. The MOSPA, with an exception not relevant here, requires a tugboat escort for all tank vessels transiting Buzzards Bay that carry 6,000 or more barrels of oil. Mass. Gen. Laws ch. 21M, § 6. The 2007 Rule has a variant tug escort provision, which does not apply at all to double-hulled barges. See 72 Fed. Reg. at 50,054, 50,059. Similar disparities exist as to manning requirements. The MOSPA demands that "[t]he navigation watch on all tow vessels transiting Buzzards bay and carrying 6,000 or more barrels of oil shall consist of at least 1 licensed deck officer or tow vessel operator, who shall serve exclusively as a lookout" and that "[t]hree licensed officers or tow vessel operators shall be on a tow vessel" when it is escorting a tank barge. Mass. Gen. Laws ch. 21M, § 4(a). The MOSPA also establishes crew requirements for tank barges. Id. § 4(b). Once again, the 2007 Rule takes a divergent approach; as to manning requirements, it is in some respects broader than the MOSPA and in some respects narrower. See 72 Fed. Reg. at 50,059.

Due to circumstances beyond the parties' control, the case below was passed from judge to judge to judge. On October 29, 2007, the Coast Guard renewed its motion for an injunction against

the enforcement of the challenged MOSPA provisions. While that motion was pending, Judge Lindsay allowed the Commonwealth to file counterclaims alleging that the Coast Guard, in the process of promulgating the 2007 Rule, had violated both the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706, and the NEPA.

In the fall of 2008, the district court (Young, J.), acting in conformity with a magistrate judge's recommendation, preliminarily enjoined the enforcement of the challenged MOSPA provisions. The parties subsequently cross-moved for summary judgment. The magistrate judge recommended that summary judgment enter for the Coast Guard on the ground that the 2007 Rule preempted the challenged MOSPA provisions.

On de novo review, the district court (Woodlock, J.) found a NEPA violation, but concluded that this violation was "essentially harmless" because "the substance of the Coast Guard's actual rulemaking analysis was the functional equivalent of what an environmental impact statement would have generated." United States v. Massachusetts, 724 F. Supp. 2d 170, 174-75 (D. Mass. 2010). The court proceeded to overrule the Commonwealth's other objections, found preemption appropriate, entered a declaratory judgment for the Coast Guard, and permanently enjoined enforcement of the controverted portions of the state statute. Id. at 175. These timely appeals followed.

## II. NEPA COMPLIANCE

We review an appeal from the entry of summary judgment de novo. URI Student Senate v. Town of Narragansett, 631 F.3d 1, 7 (1st Cir. 2011). In the administrative law context, our evaluation is informed by the APA. See Assoc'd Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). That paradigm applies here. Under it, we may set aside agency action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[2]

Employing this yardstick, an agency rule fails "if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." Assoc'd Fisheries, 127 F.3d at 109.

In this case, our task begins and ends with the issue of NEPA compliance. We focus the lens of our inquiry accordingly.

### A. The NEPA Framework.

The NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It has dual objectives. "First, it 'places upon an agency the obligation to consider every

---

[2] There is a special interplay between summary judgment and discretionary agency judgments under the APA. See, e.g., Mass. Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 525 (1st Cir. 1993). We need not dwell upon those subtleties here.

significant aspect of the environmental impact of a proposed action.'" Balt. Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97 (1983) (quoting Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 553 (1978)). "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Id.

As a means of achieving its twin goals, the NEPA directs federal agencies, "to the fullest extent possible," to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332. Timing is important. If the NEPA's prescribed analysis is to factor into the decisionmaking process as Congress intended, the agency must "consider all significant environmental impacts before choosing a course of action." Sierra Club v. Marsh, 872 F.2d 497, 502 (1st Cir. 1989); see Vt. Yankee, 435 U.S. at 558; Wilderness Watch v. Mainella, 375 F.3d 1085, 1096 (11th Cir. 2004). After all, "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." Winter v. NRDC, 129 S. Ct. 365, 376 (2008). It follows inexorably that "when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." Massachusetts v. Watt, 716 F.2d 946, 952 (1st Cir. 1983).

-9-

Though significant, the NEPA's requirements are procedural in nature. Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 756 (2004). So long as the environmental effects of a proposed action have been adequately identified and studied, the agency is free to weigh those effects and decide — within the limits fixed by the APA — that other values overbalance environmental costs. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). Seen in this light, the role of judicial review is simply to "insure that the agency has taken a 'hard look' at environmental consequences." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976).

The NEPA's general requirement that federal agencies prepare either an EIS or an EA in anticipation of any major action is not absolute. The exemptions are fleshed out in implementing regulations promulgated by the Council on Environmental Quality (CEQ). See 40 C.F.R. § 1500.3. The CEQ is a body that Congress created for the express purpose of administering the NEPA. See 42 U.S.C. § 4342. Under this regulatory regime, an affected agency is charged in the first instance with determining if a proposed action is one which, on the one hand, ordinarily requires an EIS, or which, on the other hand, is exempted from environmental review because it comes within a categorical exclusion. 40 C.F.R. § 1501.4(a). A categorical exclusion is meant to encompass "a category of actions which do not individually or cumulatively have

a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." Id. § 1508.4. Such actions normally do not require the preparation of either an EIS or an EA. Id.

If a proposed agency action is not one that ordinarily would require an EIS, but nevertheless is not exempted from environmental review, the agency must prepare an EA. Id. § 1501.4(b). That EA is intended to serve as the foundation upon which the agency will make its determination about whether it is necessary to prepare an EIS. Id. § 1501.4(c). While an EA is not as extensive as an EIS, it nonetheless must include "discussion[] . . . of the environmental impacts of the proposed action and alternatives." Id. § 1508.9(b).

### B. **The Coast Guard's Supplemental Procedures**.

The CEQ regulations are not meant to stand alone but, rather, contemplate that the agencies to which they apply adopt supplemental procedures, if and as needed. Id. § 1507.3(a). The Coast Guard has adopted such supplemental procedures and codified them in Commandant Instruction M16475.1D (Nov. 29, 2000). These supplemental procedures describe thirty-five categorical exclusions (CEs). COMDTINST M16475.1D, fig. 2-1. This compendium includes CEs that cover "[r]egulations establishing, disestablishing, or changing Regulated Navigation Areas and security or safety zones"

and "[r]egulations in aid of navigation." Id. fig. 2-1, ¶34(g), (i). When promulgating the 2007 Rule, the Coast Guard asserted the applicability of both of these exclusions. 72 Fed. Reg. at 50,058. The Commonwealth does not dispute that the Coast Guard's proposed action fell within the compass of these CEs. But the applicability of a CE does not automatically relieve an agency of the obligation to prepare either an EIS or an EA.

The CEQ regulations recognize that even agency actions that are of a kind typically excluded from NEPA review by the operation of a CE "may have a significant environmental effect." 40 C.F.R. § 1508.4. In response to that concern, the Coast Guard, like many other agencies, has enumerated in its supplemental procedures various considerations to guide its assessment of whether a particular action, though nominally covered by a CE, involves "extraordinary circumstances" and, thus, requires the preparation of either an EIS or an EA. COMDTINST M16475.1D, ch. 2, § B.2.b. In effect, this constitutes a list of exceptions to the exclusions.

The Coast Guard has identified ten extraordinary circumstances exceptions which, if applicable, may trump a CE and require it to prepare an EIS or an EA. Id. By the same token, the Coast Guard may not rely upon a CE if its proposed action triggers any of the extraordinary circumstances exceptions limned in an incorporated Department of Transportation (DOT) order. Id. The

-12-

incorporated order requires the preparation of an EIS or an EA for agency actions that are likely to involve any of four additional, albeit overlapping, extraordinary circumstances. Id. encl. 1 (DOT 5610.1C), § 20.b.(2).

The Coast Guard attempts to put a new gloss on the extraordinary circumstances described in its NEPA procedures. It claims the right to do so in consequence of its reassignment from the DOT to the Department of Homeland Security (DHS), which occurred in 2003. This reassignment, the Coast Guard implies, rendered its preexisting NEPA compliance procedures subject to creative interpretation (at least to the extent that they conflict with the DHS's own regulations).[3] Under the guise of this creative interpretation, the Coast Guard rips out the heart of its own exceptions.

The Coast Guard cites very little authority for this partial repudiation of its clearly delineated extraordinary circumstances exceptions. In taking this position, it cites cases such as Auer v. Robbins, 519 U.S. 452, 461 (1997), and claims that it has the authority to interpret its own supplemental procedures. The existence of that power is undeniable, but it cannot be wielded to read a provision in a manner that is utterly contrary to its plain language. Id. (explaining that an agency's interpretation of

---

[3] The DHS's regulations are set forth in 71 Fed. Reg. 16,790 (Apr. 4, 2006).

-13-

its own regulations is controlling <u>unless</u> "plainly erroneous or inconsistent with the regulation" (quoting <u>Robertson</u>, 490 U.S. at 359)). For purposes of this case, the Coast Guard attempts to nullify plainly stated provisions of its own longstanding NEPA procedures — and judicial deference to agency interpretations cannot be stretched so far.[4]

In its March 2006 notice of proposed rulemaking, the Coast Guard explicitly cited Commandant Instruction M16475.1D — its own set of procedures, which incorporate the DOT order. It described this matrix as the document that would "guide[] the Coast Guard in complying with the [NEPA]." 71 Fed. Reg. 15,649, 15,654 (Mar. 29, 2006). In August of 2007, the Coast Guard reiterated this point when it published the final rule. 72 Fed. Reg. at 50,058. In neither of these notices did the Coast Guard identify any other instructions as applicable to its NEPA compliance. Neither the DHS's regulations nor the Coast Guard's newly minted interpretation of its own procedures were ever mentioned.

No incongruity inheres in the Coast Guard's continued use of the incorporated DOT order. Under the CEQ regulations, nothing prevents one agency from incorporating into its

---

[4] To cite but one example, where Commandant Instruction M16475.1D makes an extraordinary circumstance applicable when an action "is likely to be highly controversial in terms of scientific validity or public opinion," the Coast Guard now seeks to interpret that provision to apply only where there exists "scientific controversy" over a proposed action, thus reading the "public opinion" language out of the exception entirely.

supplemental NEPA procedures guidance borrowed from another agency. See 40 C.F.R. § 1507.3. And in any event, even if the incorporated DOT order were somehow set aside, the Coast Guard's professed interpretation of its own procedures itself defies logic and exceeds the bounds of reasonable agency interpretations entitled to deference.

The government must turn square corners when dealing with the public, and we think that it is bound by its express reliance on the document that includes the incorporated DOT order and makes no reference to the supposed DHS policy. Cf. NRDC v. EPA, 824 F.2d 1258, 1284-85 (1st Cir. 1987) (explaining that agencies must present proposals to the public with sufficiently clear notice so that commenters will have a fair opportunity to express their views). The Coast Guard took the position during the rulemaking process incident to the 2007 Rule that the document that included the incorporated DOT order was part of the regulatory mix. It never provided the public with any hint that either its reassignment to the DHS or the DHS's policies had effected a change in its procedures. Given the Coast Guard's continued reliance on materials predating its reassignment to the DHS, the absence of any explicit disavowal of the incorporated DOT order, and its utter failure to integrate the DHS regulations into its procedures,[5] we

_____

[5] This failure is particularly perplexing in light of the DHS's declarations that its "Directive shall prevail in case of any inconsistencies" and that the Coast Guard "will amend [its]

-15-

hold that the NEPA determination in this case must give full effect to the content of Commandant Instruction M16475.1D.

## C. **The Violation**.

The next question that we must answer is whether the Coast Guard complied with the NEPA. In promulgating the 2007 Rule, it used a standard environmental checklist. See COMDTINST M16475.1D, encl. 2. This checklist included prompts corresponding to the extraordinary circumstances exceptions that might prevent the Coast Guard from relying on a CE. Each prompt received a simple "yes" or "no" answer.

The completed checklist contains a negative response to the prompt asking whether the proposed action is "likely to [have] a significant effect on public health or safety." Elaborating, the document explains that "[i]mplementation of the rule would have an indirect and beneficial impact on public health and safety" due to its anticipated prevention of future oil spills in Buzzards Bay. Negative responses also accompany prompts asking whether the proposed action presents the potential "to be highly controversial in terms of scientific validity or public opinion" or whether the proposed action would potentially violate state environmental law. There is no discussion of the reasoning behind these negative responses.

procedures to conform to this Directive." 71 Fed. Reg. at 16,790. The Coast Guard has apparently ignored this mandate.

The checklist does contain a lone affirmative response. This affirmative response is to the prompt asking whether the proposed action is to take place "on or near a unique characteristic of the geographic area." The Coast Guard added, in a wholly conclusory fashion, that the proposed action "is projected to produce negligible adverse impacts on the environment from increased air and water emissions from the additional tugs."

In a bid to shut off further inquiry into the sufficiency of those responses, the Coast Guard says that the Commonwealth's failure to object during the notice-and-comment period to its proposed reliance on a CE amounts to a waiver. As articulated, this claim rests entirely on the Supreme Court's decision in Public Citizen, where the Court explained that "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions.'" 541 U.S. at 764 (alterations in original) (quoting Vt. Yankee, 435 U.S. at 553). But nothing in Public Citizen shifts the burden of ensuring NEPA compliance from the agency that is proposing an action to those who wish to challenge that action. Indeed, the Public Citizen Court stressed that "the agency bears the primary responsibility to ensure that it complies with NEPA." Id. at 765.

In all events, the case at hand is readily distinguishable from Public Citizen. There, the agency had

-17-

prepared an EA and determined that it need not take the more laborious step of preparing an EIS.  Id. at 763.  The challenge to that determination was premised on the agency's supposed failure to consider specific alternatives when compiling the EA, but the challenger had not objected to the EA on that ground during the comment period.  Id. at 764.  In fine, the dispute was one about the substance of what evidence the agency should have considered.

By contrast, the dispute here is functional.  The Coast Guard's reliance on a CE permitted it to avoid any environmental analysis.  The principles announced in Public Citizen cannot be twisted so far as to cover such a situation.  See 'Ilio'ulaokalani Coal. v. Rumsfeld, 464 F.3d 1083, 1092 (9th Cir. 2006).

This brings us to the question of whether the Coast Guard, in relying on a CE as a means of sidestepping any meaningful environmental analysis, acted arbitrarily.  In arguing for an affirmative answer to this question, the Commonwealth focuses on four extraordinary circumstances exceptions that, in its view, prevented the agency from relying on a CE.  These extraordinary circumstances exceptions relate to (i) agency actions affecting "[p]ublic health or safety," (ii) those touching upon a site including or "near a unique characteristic of the geographic area," (iii) those "likely to be highly controversial in terms of scientific validity or public opinion," and (iv) those creating "[a] potential or threatened violation of . . . state . . . law

-18-

. . . imposed for the protection of the environment." COMDTINST M16475.1D, ch. 2, § B.2.b. If any one of these exceptions applies, then the Coast Guard was bound to determine whether further analysis was required based on the potential environmental effects of the proposed action. Id. And in that event, reliance on the CE would be inappropriate.

Here, we can limit our consideration to the extraordinary circumstances exception for proposed actions that are "likely to be highly controversial in terms of . . . public opinion" (to the extent that other exceptions might also apply, they are superfluous).[6] Careful perscrutation of the record in this case persuades us that the Coast Guard's bareboned negative response — a simple "no" — to the prompt asking whether the proposed action was likely to be highly controversial was arbitrary and capricious.

Judicial review of the applicability of an extraordinary circumstances exception is informed by the agency's guidelines. See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1992) (explaining that internal guides for agency employees are evidence of agency's custom and practice); Burroughs v. Hills, 741 F.2d 1525, 1529 (7th Cir. 1984) (per curiam)

---

[6] The concern about reliance on a CE for potentially controversial actions, expressed in the Coast Guard's procedures, is echoed in the incorporated DOT order, which likewise prohibits the use of a CE when the proposed action is likely to involve "substantial controversy." COMDTINST M16475.1D, encl. 1 (DOT 5610.1C), § 20.b.(2).

-19-

(similar). The Coast Guard's guidelines outline the considerations that should be factored into the decisionmaker's evaluative process. COMDTINST M16475.1D, encl. 2. As to the exception for "highly controversial" actions, they direct decisionmakers to "[c]onsider first whether [the] action is likely to be controversial in any way." Id. If the decisionmaker concludes that it is, he is directed to "consider whether this controversy is likely to have an environmental element." Id. The guidelines specifically caution decisionmakers to "be sure not to interpret the word 'environmental' too narrowly" to guard against "missing a controversial issue that should be addressed under NEPA." Id.

We need not tarry. The record in this case belies the Coast Guard's conclusory determination that its proposed action was not likely to be highly controversial within the meaning of its own procedures and guidelines. During the rulemaking process, the Coast Guard received a plethora of worried comments from local officials, state legislators, and other representatives of state government. The state's principal environmental regulator, the Massachusetts Department of Environmental Protection (MDEP), expressed grave concerns about the potential environmental consequences of the proposed rule. The MDEP indicated that, in its strongly held view, tug escorts for all tank barges were necessary to reduce the risk of oil spills in Buzzards Bay. The MDEP specifically noted that escort requirements for double-hulled tank

barges were enforced "in other environmentally sensitive waters" and should not be forsaken in Buzzards Bay. The Massachusetts congressional delegation urged the Coast Guard to adopt broader tug escort standards parallel to those embedded in the MOSPA, so that both single and double-hulled barges would be covered. This coverage was essential, the solons wrote, in order to "provide[] crucial protection" for Buzzards Bay.

The Coast Guard shrugs off this tidal wave of comments as mere political opposition. Of course, many of the comments were submitted by "political" figures. But in a democracy, citizens may justifiably rely on political leaders to speak for them, and the fervent community concern expressed here went directly to potentially serious environmental effects of the Coast Guard's proposed action. This is the very type of controversy that the Coast Guard's guidelines direct decisionmakers to consider. At any rate, the public officials' comments were supplemented by submissions from private groups and individuals who believed that protections beyond those described in the proposed rule were needed to prevent environmental damage to Buzzards Bay.

What makes the Coast Guard's refusal to recognize the potential for controversy all the more difficult to fathom is that, during the notice-and-comment period, the Coast Guard was already embroiled in litigation that touched upon the environmental effects of a prior rule that affected Buzzards Bay. It made its decision

to rely on a CE (and thereby avoid a more in-depth environmental analysis) while this litigation remained unresolved. At the very least, the pendency of that bitterly contested case should have alerted the Coast Guard to the existence of a serious disagreement about the wisdom of displacing the Commonwealth's regulatory regime and the environmental effects of the proposed federal action.

The short of it is that, during the time when rulemaking was underway, there was ferocious and widespread opposition to the Coast Guard's approach to the regulation of oil barges in Buzzards Bay. The Coast Guard knew of this opposition and also knew that much of it implicated the not implausible fear that environmental harm would ensue should the protections afforded by the MOSPA be eliminated and the proposed federal standards adopted. In the idiom of the Coast Guard's own procedures, "the potential significance of the proposed action's effects on the environment" was great. COMDTINST M16475.1D, ch. 2, § B.2.b. In the view of many, the proposed rule threatened to decrease materially the level of protection against oil spills in Buzzards Bay. Given these realities, we conclude, as did the district court, that the Coast Guard's eschewal of any meaningful environmental inquiry was arbitrary and capricious. See Massachusetts, 724 F. Supp. 2d at 174 (characterizing Coast Guard's decision not to prepare an EIS as "an act of procedural hubris").

## D. **Harmless Error**.

This does not end our voyage. The Coast Guard contends that even if the existence of extraordinary circumstances foreclosed it from relying on a CE, its failure to prepare either an EIS or an EA was harmless. We turn to this contention.

Assuredly, NEPA violations are subject to harmless error review. See Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 61 (1st Cir. 2001); see also 5 U.S.C. § 706. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 129 S. Ct. 1696, 1706 (2009). The circumstances of a particular case often will make clear whether the error was harmless or not. Id. In this case, the Coast Guard premises its harmless error argument on the notion that it conducted an analysis functionally equivalent to an EIS or an EA during the rulemaking process. The district court accepted this argument, relying heavily on our decision in Save Our Heritage. See Massachusetts, 724 F. Supp. 2d at 175. That reliance was misplaced.

In Save Our Heritage, the agency had determined that a proposed modification to a preexisting rule (authorizing the addition of a few new flights) would have a de minimis environmental impact and, thus, invoked a CE to pretermit further NEPA review. We noted that the agency had "directly studied the three types of potential effects from the additional flights:

-23-

noise, fuel emissions, and surface traffic." 269 F.3d at 58-59. Moreover, it had "extrapolated" from two previously prepared documents: a generic environmental impact report (which had anticipated the future environmental effects of increased commercial aviation in the area) and a prior surface traffic study. Id. at 59. Finally, to confirm the continued reliability and accuracy of the findings contained in the generic environmental impact report, the agency compared its projections to actual growth patterns. Id. On these facts, we applied the harmless error doctrine and concluded that it would "make[] no sense to remand for an environmental assessment where, as here, the [agency] has already made a reasoned finding that the environmental effects are de minimis." Id. at 61.

The case at hand is readily distinguishable from Save Our Heritage. Although the Coast Guard, in its advance notice of proposed rulemaking, mentioned two prior local studies (a 1996 regional risk assessment recommendation and a 2003 safety assessment), see 69 Fed. Reg. 62,427, 62,428 (Oct. 26, 2004), there is no indication that it took any steps to confirm the continued relevance of the information contained in those studies. The same is true of a 1999 regulatory assessment prepared for Puget Sound and included in the administrative record here.

In all events, these reports standing alone are neither sufficiently focused nor sufficiently detailed to serve, separately

-24-

or in cumulation, as a proxy for the environmental analysis that the NEPA requires. The 1996 study recommended a Regulated Navigation Area, which, when adopted, would "impose[] certain requirements on single-hulled tank barges transiting New England waters, including Buzzards Bay." Id. The record offers no further information about this study. The 2003 report — a ports and waterways safety assessment — recognized "that the risk for oil or hazardous material discharge in Buzzards Bay is relatively high" and that one way of reducing this risk would be to "establish requirements for escort tugs." Id. But this report did not purpose to evaluate the merits (or relative merits) of any particular courses of action. Rather, its goal was to spur regional risk mitigation efforts by generating input from interested parties about ways to reduce the risks associated with a broad range of navigation concerns.

The last of the documents upon which the Coast Guard leans — the 1999 regulatory assessment for Puget Sound — goes into some depth in describing "the potential impact of oil spills on the environment." But this data is presented in the site-specific context of the topography and environmental characteristics of a body of water some 2,500 miles distant from Buzzards Bay. While this assessment could be relevant, the Coast Guard made no explanation of how it might apply to the presumably different topography and environmental characteristics of Buzzards Bay.

These shortcomings are troubling, but the sockdolager is that the Coast Guard did not perform any environmental analysis at all. Indeed, it made no site-specific appraisal of the potential environmental effects of its proposed action. For ought that appears, it took no "hard look" at the situation. It gave the matter the barest of glances and, in the parlance of the Save Our Heritage court, made no "reasoned finding." 269 F.3d at 61.

In a nutshell, this is not a case, like Save Our Heritage, in which an agency, while failing to carry out a formal EIS or EA, nevertheless performed a substantial environmental analysis. The absence of any such analysis is antithetic to a finding of harmlessness. See Wilderness Watch, 375 F.3d at 1096 (noting that courts "have only been willing to declare a NEPA violation harmless when the relevant decision makers actually engaged in significant environmental analysis prior to the decision but failed to comply with the exact procedures mandated"); see also Cal. Wilderness Coal. v. U.S. Dep't of Energy, 631 F.3d 1072, 1106 (9th Cir. 2011) (finding error not harmless where agency had not shown that it had taken a "hard look" at the environmental consequences of its proposed action).

The Coast Guard suggests that the comments submitted during the rulemaking process compensate for the missing environmental analysis. We do not agree. Although these comments may have brought certain environmental concerns to the agency's

attention, they did not bridge the gap between agency awareness of potentially detrimental environmental effects and agency analysis of those effects. It is precisely such an analysis that the NEPA requires. See 40 C.F.R. § 1508.9(b) (requiring an EA to include discussion "of the environmental impacts of the proposed action and alternatives").

At the expense of carting coal to Newcastle, we add that the NEPA framework is designed in part to stimulate public participation in the rulemaking process. See Pub. Citizen, 541 U.S. at 768 (describing an EIS as intended to "provid[e] a springboard for public comment" (alteration in original) (quoting Robertson, 490 U.S. at 349)); New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 708 (10th Cir. 2009) (finding failure to prepare a supplemental EIS not harmless and noting that "[a] public comment period is beneficial only to the extent the public has meaningful information on which to comment"). It would be Kafkaesque to deem the very comments submitted by the public, in and of themselves, a competent proxy for the NEPA determination that is meant to prompt and inform such comments.

What we have said to this point dictates what must be done. The error here was one of function, not merely of form. The administrative record, viewed as a whole, does not show that the Coast Guard ever analyzed, or even adequately studied, the

environmental impact of its proposed action. Consequently, its failure to prepare either an EIS or an EA was not harmless.[7]

## III. CONCLUSION

We need go no further. Where, as here, an agency has failed to satisfy its obligations under the NEPA and its error is not demonstrably harmless, the appropriate remedy is a remand to the agency for performance of those obligations. See, e.g., Georgetown Univ. Hosp. v. Bowen, 821 F.2d 750, 758 (D.C. Cir. 1987). Accordingly, we reverse the entry of summary judgment, vacate the injunction, and return the case to the district court with instructions to remand it to the Coast Guard for further proceedings consistent with this opinion. We take no view of the overarching preemption issue, the applicability vel non of any other extraordinary circumstances exception, the APA issue, or any of the parties' other contentions.

**So Ordered**.

---

[7] For present purposes, we need not decide whether the Coast Guard should have prepared an EIS or an EA. What is apparent is that some further level of analysis was required.

-28-